Thompson J.
The question now submitted to the court is, whether it was competent for the defendant, on the trial to go into evidence as to the merits of the judgment obtained in Vermont; or, in other words, whether this judgment is to be considered as a foreign judgment, and only •prima facie evidence of the debt ?
This case was submitted without argument, and the only point, I conceive, presented for consideration is, whether it was competent for the defendant, on the trial, to open the judgment, and go into an inquiry into the original merits of the action tried in the state of Vermont. I shall assume, in the exanination of this question, as points conceded, and which I think, the case will fully authorize me to take for ^granted, that there was a fair and [*462] impartial trial had between these parties in the state of Vermont, and that by the laws and, usage of that state, the judgment would be conclusive between the parties there. If such was not the case, it was incumbent on the defendant either to disclose it by pleading, or set it up as a defence, under a general plea. Nothing is here set *576 forth in any way impeaching the justice of this judgment, nor any allegation that it was irregularly or unduly obtained. If I am correct, then, as to the true question presented by the case, and the object of the defendant was to go into an examination of the cause on his part, as if it had never been before tried, I should say it was not competent for him to go into such an examination, but that the judgment was conclusive between the parties. As a general rule on this subject, I should consider judgments in neighboring states prima facie evidence of the demand, but liable to be opened and examined in the same manner only as they would be in the state where they were rendered. This I think a plain and simple rule, calculated to promote the ends of justice, and the one necessarily resulting from the political connection between the states; imposed by tne constitution and law of the united government relating to this subject. To say that every action of slander, assault and battery, &c. or for a fraud, as was the case before -us, and which had been fairly tried, and fully examined in a neighboring state, and judgment rendered, should be again opened, as if no trial had been had, would be manifestly unjust, and tending to oppression. To say that the judgment shall be conclusive between the parties would, in many instances, be giving it a more binding force than it has in the state where rendered; and to put it on the footing of foreign judgments altogether, would be considering that part of the constitution relative to the records and judical proceedings of other states as a dead letter ; and, besides, to say this judgment is to be considered in the light of a foreign judgment only, might perhaps, leave the question doubtful and unsettled how far it was examinable. In the case of Wallcer v. Witter, Doug. Rep. 4, it is decided that a foreign judgment is prima facie evidence of the debt, by which I understand the court to mean, that it is [*463] *not incumbent upon the plaintiff, in the first instance, to prove the ground, nature and extent of the demand on which the judgment had been obtained, *577 Thus far, I think, judgments obtained in sister states ought to be considered analogous to foreign j udgments ; and in the case of Sinclair v. Fraser, Doug. 5, in note, decided in the House of Lords, on an appeal from the court of sessions in Scotland, the same principle was adopted as to a foreign judgment being prima facie evidence of the debt) but the court there said, that it was competent to the defendant to impeach the justice of it, or to shozv it to have leen irregularly or unduly obtained. These would appear to be terms sufficiently broad to authorize the opening the judgment in every possible case; for it would be impossible to decide whether injustice had been done by the original judgment, without examining the whole merits of the action. Independent, however, of this consideration, I cannot view the judgment obtained in the state of Vermont in the light of, a foreign judgment only, without disregarding the constitution of the United States, and the act of congress, as having no relation to the subject. The 4th article of the constitution declares, “ That full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state, and 4he congress may, by general laws, prescribe the manner in which such acts, records and proceedings shall le proved, and the effect thereof." This article, I think, manifestly presents two subjects for legislative provision; 1st. To prescribe the manner of proving such acts, records and proceedings; and 2dly. Their effect. In pursuance of this power we find congress, by an act passed 26th May, 1790, (Laws H. S. vol. 1, 159,) after prescribing the mode of proof, declaring, “ That the said records and judicial proceedings, authenticated as aforesaid, shall have such faith and credit given to them, in every court within the United States, as they have by law or usage in the courts of the state from whence the said records, are or shall b.e taken. The framers of this constitution, doubtless, well understood the light in which foreign judgments were viewed in courts of justice, and must have intended, by this article, to place .the states upon a different footing with *578 respect to each other than that on which they stood [*464] *in relation to foreign nations; had not this been their intention, they would have beeen silent on the subject. I am aware that the old confederation contained a similar article, (4th article,) declaring that “ Fall faith and credit shall be given in each of these states to the records, acts and judicial proceedings of the courts and magistrates of every other state.” The construction to be given to this article, came, in some measure, under consideration in several of the state courts prior to the adoption of the constitution, but in no case, as far as my researches have extended, under circumstances analogous to the present; and, so far as the cases that I have examined look to the present question, I think we shall find principles recognized which are in perfect unison with those I have adopted. In the case of James v. Alien, 1 Dall. 188, decided in Pennsylvania, in the court of common pleas, in Philadelphia county, in the year 1786, the question directly before the court was, whether the defendant’s discharge from imprisonment, by virtue of an insolvent act of the state of New Jersey, would entitle him to a like discharge in Pennsylvania, and the court determined not. But the decision was founded on the nature and terms of the New Jersey insolvent act, saying it was a private act, local in its nature and local in its terms, and went no farther than to discharge him from imprisonment in the jail of Essex county, in the state of New Jersey. And the case of Phelps v. Holker, 1 Dall. 261, decided in the supreme court of Pennsylvania, in the year 1788, was an action of debt, brought on a judgment obtained in Massachusetts, under their foreign attachment act, and the court decided that it was not conclusive, on the ground that it was a proceeding in rem, and ought not to be extended farther than the property attached, the act declaring that the judgment and execution in a foreign attachment shall only go against the goods attached. The case of Kibbe v. Kibbe, Kirby’s Rep. 119, decided in the superior court of the state of Connecticut, in the year 1786, was an *579 action of debt upon a judgment obtained in Massachusetts, and the court refused to sustain the action, on the ground that the defendant had not been personally served with process to appear in the original cause. The court saying, full credence ought to be ^"given to the j udg- [*465] ments of the courts in any of the United States, where both parties are within the jurisdiction of such courts at the time of commencing the suit, and are duly served with the process, and have, or might have had, a fair trial of the cause. Thus, we see, in these cases that the court examined into the law of the state where the proceedings were had, in order to determine their operation and effect But, as far as any decision in the circuit court of the United States ought to have weight in giving a construction to the constitution and act of congress, we have the question settled in the case of Armstrong v. Carsons, 2 Dall. 302, decided in Pennsylvania, in the year 1794. The question before the court was, whether nil debet was a good plea to an action of debt on a judgment obtained in the superior court of Dew Jersey; and Wilson, Justice, said if the plea xoould be bad in the courts of Neiu Jersey, it is bad here; for whatever doubts there might be on the words of the constitution, the act of congress effectually removes them, declaring, in direct terms, that the record shall have the same effect in this court as in the court from which it was taken. The rule intended by the court to be prescribed here, clearly was the one which would have been adopted by the court-in the state where the judgment was rendered. Although the act of congress does not adopt the term effect, as stated by the judge, yet, if it means any thing, it means to declare the effect. It says, “ The said records and judicial proceedings, authenticated as aforesaid, shall have such faith and credit given to them, in every court within the United States, as they have, by law or usage, in the courts of the state from whence the said records are, or shall be taken.” If the constitution, instead of saying the records &c. shall have full faith and credit given them, had adopted the pre« *580 cise language of this act, it appears to me there would have been but little doubt but that it would have been considered equivalent to declaring such records to have the like effect in every court within the United States as in "the courts of the state where rendered. It being a subject within the power of congress to declare the effect, I do not see why the act ought not to receive the same construction.
If nothing more was intended than to declare the [*466] manner of *authenticating such records and proceedings, this part of the act is useless; nay, worse it is mischievous, being calculated to mislead. I am the more inclined to think congress intended tQ declare the effect, because the rule there adopted appears to me to be the only one that could, with propriety, be prescribed, as there -was no general and uniform practice in the different states on this subject. If a judgment in the state of Connecticut would not be conclusive there, but only prima facie evidence, it would be unreasonable to consider it conclusive here; and if conclusive there between the parties, I can see no substantial reason against considering it so here. When the matter has been once litigated, and the merits fairly tried, it appears tome to be contrary to sound -principles, and tending to promote litigation, and against the very genius and spirit of the article of the constitution above referred to, again to open the judgment. I think the rule laid down by the court, in the case of Kibbe v. Kibbe, above cited, is founded in justice and good sense, that the judgments of courts, in sister states, ought to receive full credence where both parties were within the jurisdiction of the court at the time of commencing the suit, ai d were duly served with process, and had, or might have had, a fair trial of the cause. This 1 take to have been the situation of the case now before us; and, on thia "ground, I am of opinion, it was not competent for the defendant to go into evidence as to the merits of the original judgment. . ■
*581 Livingston, J.
This is an action of debt on a judgment of the supreme court of Vermont, and we are to determine “whether, after a full defence in that state, its justice is impeachable; or, in other words, whether it is to IS regarded as a foreign judgment, and, as such, only prima facie evidence of a debt ?”
As the court are not unanimous, it is matter óf regret that a question so important is to be decided without argument. To me it appeared somewhat extraordinary, on the first hearing of this case, that it should be attempted to open the judgment of a sister state, when the party had been arrested, and made his defence. It struck me as conclusive ; and that, on being satisfied of its existence, it was our duty *to enforce it, without examining [*467] into the grounds of it, or into the conduct of the court or jury who decided it. These impressions, instead of being effaced, have acquired strength from posterior rasearch.
By the common law of England, the consideration of foreign judgments need not be stated in the declaration, for .they are received as evidence of debt liable to be impeached by the defendant, on the ground of injustice, or because of being irregularly or unduly obtained. When a person having obtained judgment in one court, applies to the tribunal of another state to put it in force, the interposition of the latter, it is said, is not ex necessitate, but only ex comitate, and, therefore, it may inquire into the original merits, to see whether there be a good ground for awarding execution; otherwise, it might sanction injustice. This reasoning is plausible, and has been adopted, among others, by Lord Kaims, in his Principles of Equity, a w< rk of which no professional gentleman should be ignorant. But, with proper deference, I must be allowed to observe, that this method of treating a foreign judgment renders it little better than a dead letter. If the whole merits are to be reviewed, the party may as well recur at once to his origi? nal cause of action, as to a record which the defendant is *582 at liberty thus to impeach. Where he has appeared, and the matter has been fully litigated before a foreign tribunal, it would, perhaps, be a rule less liable to exception to ad mit it, wi#iout any examination, as conclusive of everything within it, between the immediate parties. The rule,' However, in England, and the practice here, are otherwise; nor can I perceive, in any of the cases, a difference between the effect of a foreign judgment by default, and one where a defence had been interposed, although Lord' Kaims appears to think a distinction exists. For, after stating a case m which a court in Scotland refused to carry into effect a judgment rendered by the king’s bench, he observes that this decree was reversed by the house of lords, because, “ in England, the decree of a foreign supreme court has such credence that judgment is immediately given, without entering into the merits, provided the matter has been litigated.” Principles of Equity, 373. Finding no authority [*468] for this ^distinction, sound as it is, I am not at liberty, if the judgment before us is to be regarded as a foreign one, to avail myself of it in deciding this cause, and to say, here the matter was litigated, and, therefore, the judgment is conclusive.
It becomes necessary then, to inquire whether, by the constitution of the United States, any difference be created in this particular between judgments rendered out of and within the United States. The former, for the sake of distinction, we will call foreign, the latter, domestic judgments, although this appellation in common parlance, be confined to judgments of our own courts.
We cannot suppose that those who penned the constitution were ignorant that a judgment, when the ground of action in its native state, (if the expression be allowed,) could not be contested, while other judgments were subjected to the strictest scrutiny. In the latter description were included as well judgments recovered extra territorium, as within any one of the United States, which at common law, were all on the same footing. To introduce a distinc *583 tian between domestic and foreign judgments, and to place the former .on the most favored footing, must have been their intention; otherwise, they would have been silent, or used terms declaratory only of the common law, so as to render them evidence of debt, but no.t conclusively so. It remains to be ascertained whether this intention has been well expressed, or whether the terms usecl, are so ambiguous or unintelligible- as to render this article of the constitution senseless and nugatory, which must be the case, if the justice of this judgment can be examined by us.
When the object of an instrument admits of no doubt, we should not hastily reject the expressions as not adequate, or incompetent. Without too much constraining their meaning, it is our duty, if they will bear the sense which they were intended to convey, to understand them accordingly. The first section of the fourth article declares, “That full faith and, credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. A congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof." It is difficult to *malce choice of language more apt to render a [*469] domestic judgment as binding here, as if it had been obtained in one of our own courts. What other signification, so natural or obvious, can be affixed to the terms, “fall faith and credit," as that, when the existence of these judgments is once established, (to ascertain, which required no constitutional provision,) they shall be received as containing the whole truth and right between the parties, and that the matters, or points settled by them shall not be drawn into dispute elsewhere. If open to litigation, there is an end of all faith and credit whatever, and the pretensions of .the parties are investigated as if they had not already been.discussed, and properly adjusted. Now, to give full faith and credit to a record, cannot consist with not believing it ourselves, or permitting others to make averments against it. If the constitution imposes on us the *584 first of these duties, we disregard the injunction the moment we allow others, or permit ourselves, to discredit or impeach a domestic judgment. I am at a loss to conceive how the true import of this article could ever become a subject of debate, or receive a construction destroying it altogether, and with it one cement of union between these states. When we give credence to an instrument we do not barely believe in its being, or existence, but assent to its contents; so if credit be given to an ambassador, by the court to which he is sent, the latter do not thereby only admit that he is invested with that character, but that what he says is true. It is the same when a witness is credited; it is his relation which is believed; not merely that he appears as a witness. In like manner if full faith and credit be given to a deposition, it does not only imply that we ■admit there is such a writing, but that we fully and implicitly rely on its contents. Why should á different meaning be adopted when similar terms are applied to a judgment. If we take them in the same sense, and, in my estimation, they admit of no other, then, by giving full faith and credit to a judgment, we not only agree that such judgment has been rendered, (which depends altogether on the proof of that fact,) but that we believe it to be just, and that the matter in dispute was properly decided. If it be otherwise, so long as we obey a constitutional [*470] ^'injunction, we cannot do wrong in regarding it in a light which the terms of the instrument import, and which appears to have been the design of those who composed it.
At the time of our confederation, (for a like article is found in that first band of union,) it was natural, after it had been agreed, that the “ free inhabitants of each state should be entitled to all the immunities of free citizens in the other states,” to engraft a provision on this subject, and, considering the general conformity between the laws and judicial proceedings of the different states, it would not have comported with courtesy, mutual confidence, or good *585 sense, to pay no more respect to domestic adjudications than to those of foreign nations, of whose laws we were ignorant, and whose modes of proceeding did not accord with those with which we had been familiar, and which we had been accustomed to regard as the best for the attainment of justice. Little doubt, therefore, can remain as to the intention of those who consented to this article of the constitution.
But if the language of'this article be of doubtful signification, some have supposed every ambiguity removed by the act of congress which passed the 26th May, 1790. (Laws U. S. vol. 1, p. 115, Folwell’s edition.) After prescribing the mode in which the records and judicial proceedings of one state shall be authenticated, so as to be admitted as proved by the court of another, this act provides, “ That the said records and judicial proceedings, authenticated as aforesaid, shall have such faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the state from whence the said records are taken.”
This law was passed in virtue of powers given to congress by the 4th article of the constitution; and if they really possessed the right of declaring the effect of domestic judgments, and these words apply to that object, they are intelligible.and effectual. If understood in that light, we are compelled to esteem a j udgment rendered in Yer mont, when properly authenticated, as binding and final as it would be regarded by the court from which the exemplification comes ; and as there is no proof of its not being conclusive * there, we must presume it [*471] to be so, and, of course, it must be equally so here. But my opinion is drawn from the constitution, and is altogether independent of this act; for it is not clear that congress had any thing to do with the effect of domestic judgments. It is extraordinary, to say the least, that after the constitution had declared that “full faith and credit” were to be given them, it shonld be left *586 with congress to vary their operation, if they thought proper. The effect could as easily be settled by the constitution, as referred to congress. I am, therefore, inclined to think, that the “ effect,” spoken of in the 4th article, refers to the proof to be prescribed by congress, that being its » immediate antecedent. They were first to say how these judgments were to be proved, and then declare the effect of "such prooij and, perhaps, this is the true intent of the act, which substantially says, that such proof (after prescrib-' ing its nature) shall be as good evidence abroad, of the existence of the judgment, as the record itself is at home. Instead, then, of expecting congress to settle the effect of domestic judgments, we must not look further than the constitution itself, which will be found sufficiently explicit. I am not apprized that a serious difficulty has ever been entertained, by the courts of the United States, respecting the true meaning of this article. In the circuit court of the United States, for the district of Pennsylvania, when Judge Wilson presided, the point we are now discussing was considered as a clear one. ‘
An action of debt had been brought on a j udgment rendered in New Jersey, in which the plea was nil debet. 2 Dall. 302. The plaintiffs insisted that this plea was inadmissible, and that “nul tiel record” being the only plea which the courts of New Jersey would sustain if the action nod been brought there, (by which the existence of the judgment is denied,) was the only proper plea in Pennsylvania.
It is stated in the report, that Ingersoll, who was concerned for the defendant, declined arguing the point, thinking it clearly against him.
Wilson, in delivering the opinion of the court, says, “ There can be no difficulty in this case. If the plea would be bad in the courts of New Jersey, it is bad here; [*472] for, *whatever doubts. there might be on the 'words of the constitution, the act of congress effectually removes them, declaring, in direct terms, that the record shall have the same effect in this court as in the court *587 from which it was taken. In the courts of New Jersey no such plea would be sustained, and therefore, it is inadmissible in any court sitting in Pennsylvania.”
This decision of a court of the United States, although not of the last resort, is entitled to a respectful consideration.
I am aware that, in some instances, mischief may result from making this rule universal, or from too rigid an adherence to it; particularly when the proceedings are by foreign attachment, or without a personal summons or arrest of the defendant. Sitting Ijere ajus dicere et non jus dare.f it would be a sufficient answer to all complaints of this kind to say, “ ita lex scripta estor perhaps, we possess the power, and I think we do, in extraordinary cases, and where it is manifest the proceedings have been ex parte, of considering them as exceptions to the general law, and as not contemplated by the constitution. This would be a better course than to render null and void one of its most important and salutary provisions. A case of this kind occurred in Pennsylvania, (1 Dall. 254,) where an action was brought on a judgment in Massauchusetts, obtained in a foreign attachment, whereon the sheriff had seized a blanket as the defendant’s reputed property. The supreme court of that state determined, not that domestic judgments were not conclusive evidence of debt, generally speaking, but, that this being a proceeding in rem, was not to be extended farther than the property attached, for by the very words of the Massachusetts’ law, which was read, it appeared that judgment and execution, in a foreign attachment, were confined to the goods attached. This case happened under the confederation, “whose articles,” says the chief justice, “ must not be construed to work evident mischief "and injustice." This decision, in which there is much good sense, instead of derogating from, harmonizes with, my construction of the constitution. Let a law be ever so plain, cases must and will happen which were *not foreseen, or would have been provided for; [*473] and courts must then determine, according to the *588 reason and spirit of the provisions, whether they include the particular subject before them. These are the cases, which “ lex non exacte definite sed arbitrio boni viri permittit.” Mow no violence is done to my understanding of this article in saying, that it does not embrace a judgment which has been rendered against a party to whom no opportunity was afforded of controverting his adversary’s demand, and who, instead of being defended by himself or by counsel of his own choice, had no other representative than an old blanket, or a log of wood. A sentence thus obtained, in defiance of the maxim “audi alteram partem" deserves not the name of a judgment: it is rather a silent and necessary act of the court, not proceeding from an exercise of discretion and reflection, or founded on a consideration of the respective rights of the parties, but the consequence of certain rules which allow a judgment in some cases to be entered, whether the defendant has been served with process or not. If, in the case which arose in Pennsylvania, She plaintiff, instead of proceeding against a blanket, had arrested the defendant, who had thereupon interposed a plea, it can hardly be doubted that the court would have held the judgment conclusive: on the ground of reason alone, it ought to prevail, as a general rule, that a judgment like this should be binding and final throughout the United States. The fear of committing injustice, by blindly enforcing it, has too much of refinement in it. It is not so much because a court abroad has done right, that we lend our aid to carry its decrees into effect, as • because it was competent to decide the question, and the parties were heard before it. Wantonly to open such judgments, from an apprehension of doing iniquity, will be attended with great hardship and inconvenience to the successful party." At an immense expense, and after great labor and delay, he has had a trial with us, and succeeded; the most eminent counsel have been employed; witnesses, from different parts of the world, have either attended in person, or been examined on commission, and a jury of twelve men have *589 pronounced in his favor, and their verdict has been confirmed by *the court: but,'before execution, [*474] the defendant escapes to another state, where he is sued on this .judgment. It is alleged there that the merits have not been fairly tried, and the judges, giving way to certain qualms, lest they- may commit a wrong in carrying our judgment into effect, try the cause again. By this time, perhaps, the plaintiff’s witnesses are dead, or not to be found: at any rate, the additional costs, pains, and delay are intolerable. Thus the inconveniences of opening domestic judgments, on the suggestion of the .party who pretends to be aggrieved, will far outweigh those which may be the consequence of a contrary rule, to which it will be easy to make-exceptions as fit cases occur.
As, then, this is a judgment neither in'rem, Which, -like sentences in the admiralty, bind^ only the -property and secure the vendee; nor by default, where the defendant was not summoned; but is against the person, and after a full defence and hearing, the constitution of the United States, and the reasonableness of the thing, constrain me to regard it as conclusive of every matter determined'by it, between the parties to the record. I cannot, therefore, listen to any allegation to the contrary, nor consent to another trial, the avowed object of which is, to impeach its verity and justice, and to bring on before us a new discussion a- the original merits.
Radcliff, J.
The question submitted to our decision is, whether the judgment in Vermont is -to be considered in the light of foreign judgments, and evidence prima facie only of the plaintiff’s demand, or shall conclude the defendant. If it is to be viewed in the light of -foreign judgments only, then a new trial is to be awarded -in the present action, otherwise .judgment -is to be Tendered for the plaintiffs.
This question arises on the first section -of''the 4th article of the constitution of-the United States, and the act-Of-con *590 gress made in pursuance of it, and may seriously affect the administration of justice in every state. It is, therefore, peculiarly interesting, that it should receive a correct and uniform decision. It has, on former occasions, incidentally occurred in this court, and opinions have been intimated ; but it has not received a direct determination. [*475] From the best consideration I am *able to give . it, I am led to the conclusion, that the judgments I of the courts of other states in the union are to be viewed i in the light of foreign judgments only.
1 Independent of the constitution of 'the United States, and the act of congress alluded to, it is clear that the judgments or decrees of the courts of a neighboring state, when made the ground of an original suit here, would be considered as foreign judgments, and, as such, by the English law and our own, would be received as prima fade evidence of the justice of the pTaintiff’s demand, but liable to be examined and impeached by the defendant. This would follow from the single consideration that the jurisdiction of each state, with respect to its internal administration of justice, is distinct and independent of every other. It remains therefore, to be seen whether the constitution and act of congress have created a different rule.
In the examination of this subject, it may -be proper to notice that the former confederation contained similar provision. By the confederation it was declared, that “fall faith and credit should be given in these states to the records, acts, and j udicial proceedings of the courts and magistrates of every other state.” At an early period, doubts appear to have arisen as to the import of the terms full faith and credit. In the case of- Phelps v. Holker, reported in 1 Dall, the supreme court of Pennsylvania decided, that this article of the confederation should not be so construed as to make a judgment, obtained on a foreign attachment in Massachusetts, conclusive in Pennsylvania.
The constitution of the United States, it seems, intended to remove these doubts, and plainly distinguishes between *591 the, faith and credit which shall be due to such records, acts, and judicial proceedings, and their legal effect or operation. It first declares, nearly in the terms of the confederation, that “full faith and credit shall be given to the public acts, records, and judicial proceedings of any other state,” and then distinctly provides, that “ congress may, by general laws, prescribe the manner in which such acts, records, and judicial proceedings shall be proved, and the effect thereof." The full faith amj credit, intended by the constitution, *cannot be interpreted to mean their legal [*476] effect, for otherwise, the subsequent provision that congress may prescribe the effect would be senseless and nugatory. The constitution makes a plain distinction between credit and effect] and that distinction, I think, is consistent with that principle of the common law, which ascribes absolute verity to the records and judicial proceedings in our own courts. When a judgment, or recovery in our own courts, is pleaded, it is alleged. as a fact, the record of which cannot be denied, and is conclusive of the fact, and it is, accordingly, the subject of a peculiar mode of trial: but its legal effect, or operation on the rights of the parties, is still to be considered, and frequently may form a distinct question. The provision in the constitution, relative to the judicial proceedings of the courts of the different states, can extend no farther.
Congress have the power to prescribe the mode of proof, and the effect. By their act of the 26th May, 1790, they have prescribed the mode of proof, but they have not declared the effect, unless the following words of the act be considered in that light: “ And the said records and judicial proceedings, authenticated as aforesaid, shall have such faith and credit given to them, in every court within the United States, as they have by law or usage in the courts of. the state from whence, the said records are, or shall be taken.”
At first view, the framers of this act seem to have intended a regulation beyond the provision contained in the *592 constitution; but if this was their intent, I think they have not accomplished their end. The constitution itself declares that full faith and credit shall be given to such proceedings. This imports absolute verity. It cannot be increased in degree, and congress had not the power to diminish the credit. When therefore, the act declares that such, faith and credit shall be given to them as they have by law or usage in the courts of the state from whence they are taken, it can mean no other than full faith and credit. „ From the nature of the thing, it can mean no more, and without impeaching the absolute verity ascribed to them by the constitution, it cannot mean less. It, therefore, leaves the credit and the question, as to the legal effect and operation, [*477] precisely where they were, and the power to prescribe the effect remains unexecuted.
It is easy to perceive, that serious difficulties would occur in attempting to carry this power into execution, and these difficulties have probably, embarrassed, and deterred congress from exercising it. In their act, we find the same terms, “faith and credit,” which are used in the constitution, and those only. The constitution, however, makes the distinction, as has been, shown, between credit and effect. With this distinction, plainly drawn, I cannot suppose that congress meant to confound it by treating the terms faith and credit, as synonymous with effect. On the contrary, they must be considered as conveying the same sense, both in the constitution and the act; and, of course, that congress have not executed the power of declaring the effect. Until that be done, the legal operation of such judgments must be the same as it was before there existed any legislative provision on the subject. Nothing more than the mode of authentication was, therefore, provided for by the act of congress. When so authenticated, they are entitled to full .faith and credit; but they are to be received as evidence merely, by which their contents are undeniably established, and their effect or operation, n '-t being- declared, remains as at the common law.
*593 I am sensible, that the case of Armstrong v. Carsons, 2 Dall. 302, stands in opposition to this doctrine. That was an action of debt in the circuit court of the United States, for the district of Pennsylvania, brought on a judgment obtained in Hew Jersey, in which the counsel for the defendant yielded the position that the judgment was conclusive ; and the court, without a previous discussion, adopted the idea, on the supposition that the act of congress had declared the effect to be conclusive. The presiding judge, in delivering the opinion of the court, states the act as having expressly declared the effect. In terms, he was evidently inaccurate, and whatever respect may be due to the decisions of that court, its opinion, in this instance, does not appear to me to be correct, nor to have been founded on a deliberate examination of the subject.
Upon the construction of this article *of the [*478] constitution, and the act of congress, I am, therefore, of opinion, that the judgments of other states are to be considered in the light of foreign judgments, and, when made the foundation of a suit in our own courts, are not conclusive, but from courtesy, are to be admitted as presumptive evidence only of a title to recover, according to our own laws. To allow them a greater effect might be attended with much inconvenience, and produce an irregular interference of jurisdiction between different states, and, in some cases, enable them to prescribe the law to each other. The consequences cannot easily be foreseen, and might often lead to injustice and individual oppression.
I am of opinion that the verdict be set aside, and a new trial be awarded.
Kent, J.
The important question arising in this case is, what is to be the effect in this court, of the judgment in Vermont, according to the constitution and laws of the United States ?
The constitution declares that a full faith and credit shall *594 be given in each state, to the public acts, records, and judicial proceedings of every other state, and that congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof.
This injunction, that they were to receive full faith and credit in every state, made a part also of the articles of confederation ; but, under those articles, it seems to have been understood that the question on • the effect of such records and judicial proceedings was still left open. In the case of James v. Allen, 1 Dall. 188, in the court of common pleas at Philadelphia, in the year 1786, a question arose on the effect of a discharge under the insolvent law of New Jersey and the construction of this article in the confederation was brought into discussion, and it was contended that a judgment, or other judicial proceedings of another state, was, by this article, rendered unexaminable, and conclusive evidence.
But the court- said, that the article would not admit of that construction, and that it was chiefly intended to oblige each state to receive the records of another, as full [*479] evidence *of such acts and judicial proceedings-Again, in the case of Phelps v. Holker, 1 Dall. 261, in the supreme court of Pennsylvania, in April term, 1788, an action of debt was brought upon a judgment in Massachusetts ; which judgment was obtained against the defendant by default,' and founded on an attachment of a blanket, which was shown to the sheriff as the reputed property of the defendant, and the question was, whether the judgment was conclusive evidence of the debt. It was contended, on one side, that the judgment was, by the articles of confederation, rendered conclusive, and that it made no difference in the case that the judgment was obtained by the process of a foreign attachment. The other side insisted that the articles of confederation provide only that, in mat• ters of evidence, mutual faith and credit should be given, and especially that they ought not to be conclusive when *595 founded on foreign attachment. The court decided, that the defendant was still at liberty to controvert and deny the debt, and that the articles of confederation must not be construed to work such evident injustice as was contained in the doctrine urged by the plaintiff. Another case I shall mention was that of Kibbe v. Kibbe, Kirby, 119, decided in the superior court of Connecticut, in the year 1786. It was an action of debt on a judgment obtained in Massachusetts by default, and founded on the attachment of a handkerchief, and so, like the preceding case, a proceeding» rem. The question came before the court on demurrer, and judgment was given for the defendant, on the ground that the court in Massachusetts had no jurisdiction of the cause; but the court admitted that full credence ought to be given to judgments in other states, where both parties were within the jurisdiction of the court, and the defendant duly served with process, and had, or might have had, a fair trial of the cause.
It appears from these decisions, that judgments in other states were not regarded under the confederation as of binding and conclusive effect; and the defendant was admitted to deny the regularity and equity of the proceedings by which the judgment was obtained. This was placing the judgments of the other states on the basis of foreign judgments, which are received only as prima fade evidence of the *debt; and it lies with the defend- [*480] ant to impeach the justice thereof, or to show them to have been irregularly or unduly granted. Sinclair v. Fraser, cited in Doug, 5, note, and in Appendix, p. 6, 7, in the case of Galbraith and Neville.
Such being the received construction of the injunction, that full faith and credit was to be given to the judicial proceedings of other states, it remains to see whether the case is altered under the existing constitution of the United States. That constitution, by authorizing congress to prescribe not only the manner in which the acts, records and proceedings of other states shall be proved, but their effecS *596 evidently distinguished between giving full faith and credit, and the giving effect to the records of another state, and until congress shall have declared by law what that effect shall be, the records of different states are left precisely in the situation they were in under the articles of confederation.
The act of congress of 26th May, 17 90, is entitled “ An act to prescribe the mode in which the public acts, records, and judicial proceedings in each state shall be authenticated, so as to take effect in every other state.” After prescribing the mode of authentication, it declares that the records and j udicial proceedings so. authenticated, shall have such faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the state from whence they are taken. This act leaves the question as to the effect of such records precisely where it found it. The articles of confederation, in the first instance and the constitution, in the second, had already declared that such records and proceedings were-to receive full faith and credit; and this act, without prescribing the effect, defines, or, rather, qualifies, the faith and credit they are to receive. Instead of full faith and credit, they are to receive such faith and credit. "We are bound to give the judgment faith and credit, and this faith and credit was considered by the state courts, while sitting under the government of the articles of confederation, as requiring full assent to the proceedings contained in the record, as matters of evidence and fact, but not as absolutely barring the doc^ against any examination! of the regularity of the proceedings, and the justice of the judgment. [*481] *1 ought here to notice the case of Armstrong v. Executors of Carson, 2 Dall. 302, as leaning against the conclusions I have drawn. It was an action of debt brought in the circuit court of the United States lor Pennsylvania district, on a judgment obtained in the state ol New Jersey.
The question was, whether the plea of nil déhet was good, and the court was of opinion, the plea being bad in New *597 Jersey, was bad there also; for whatever doubts there might be on the words of the constitution, the act of congress effectually removed them, by declaring, in direct terms, that the record should have the same effect in that court as in the court from which it was taken. But the reason given for this opinion, if the report of the case be correct, is clearly founded in mistake.
The act of congress does not declare the record shall have the same effect, but only the same faith and credit, and there is a manifest and essential difference between the one mode of expression and the other. If, therefore, as the court intimated, there were doubts on the words of the constitution, those doubts, so far from being removed, are rather increased by the law. The language of the constitution is, at least, as cogent and comprehensive, if not more so, than the language of the law.
It is pretty evident that the constitution meant nothing more by full faith and credit, than what respected the evidence of such proceedings; for the words are applied to public acts, as well as to judicial matters; nor ought the act of congress to be carried further than the words will warrant. When we reflect in what manner judgments may, in some instances, be obtained, as in the cases cited, by the attachment of a handkerchief or blanket, it is more favorable to the harmony of the union, and to public justice, that the judgments of the several states should be put on the footing of foreign judgments, than that they should be held absolutely binding and conclusive, or as much so as they may be by the laws of the state which authorized the proceeding; and if we may question the binding force of the proceeding or judgment in one case, we may in another; for, the acts of congress has no exceptions, and must receive a uriform Construction. [*482] If a debtor be discharged from imprisonment, or from his debts, by the insolvent act of some other state ; or if their courts be authoized to grant a stay of suits for a time, are we bound by those acts; for they all are, or may *598 be, judicial proceedings. There are no considerations of national policy that could induce us to suppose the act of congress went the whole length of closing the investigation of the judgment. It would be going further than ever was done in any civilized country, even with respect to its own dominions. Between England and Scotland, England and Wales, (Walker v. Witter, Doug. 1; Sinclair v. Fraser, cited in the notes, and Galbraith v. Neville, 29 Geo. III. cited in the Appendix, p. 5,) or England and its colonial establishments the union is as intimate and as interesting as between the several states; and yet the judgments in Scotland, (Kaims’Equity, vol. 2, 365, 377,) or Wales, or Jamaica, for instance, are held to be foreign judgments. So the court of sessions, in Scotland, consider judgments rendered in England as foreign judgments; that they have no intrinsic authority extra territorium; and that in actions upon them, they are to be presumed just till the contrary be proved; and if they are shown to be unjust, or irregular, the suit upon them will not be sustained.
The judgments of other states have been treated in this court in the light of foreign judgments, by admitting the plea of nil debet(a) to be the proper plea, instead of the plea of nul tiel record. The court had intimated doubts on the question in prior cases; (Le Conte v. Pendleton, April term 1799, and Collet ads. Bush, January term, 1801;) but in the case of Post and another v. Nerly, in January term last, they decided that nul tiel record was a bad plea; and it follows, pretty conclusively, that if a judgment of another state is not to be treated in the pleadings as a record, it cannot have the same obligatory force. So in the case of Phelps v. Bryant, Administrator, decided at the last term, we refused to sustain an action on a decree of the superior court of Connecticut, founded on the service of a summons within this state. An act of the legislature had rendered all *599 judgments and decrees, founded on such service, void, as far as respected our own government. But if the decree ' in that case was of conclusive effect under the constitution and laws of the union, the plea to the merits of that decree, as resulting from the irregular commencement of the suit, would have been bad notwithstanding our statute.
*The result of my opinion is, that the judgment in [*483] question is to be considered in the light of a foreign judgment, and only prima facie evidence of the demand.(a)
*600 Peceptum est optima raiione in executione senientiae alibi latee, servari jus loci in qua fit executio, non ubi res judeata est. 2 Huber. 540.
Lewis, Ch. J.
The question between these parties is both important and difficult; and my opinion upon it has been formed with diffidence and deliberation. Were the whole case, or both parties, before us for consideration, it would be easy to determine on their respective merits. But we are called to decide an abstract proposition; whether under the article of the constitution, and the' act of the general government, referred to, the judgments of Courts of another state shall be so conclusive here as to exclude all further examination of their merits ? Had this article gone no further than that of the confederation on the same subject, I should have doubted the correctness of the principles of decision in Phelps against Holher, as applicable to it; and should have understood full faith and credit in the same sense that implicit faith is applied in Westminister Hall to the records of a court of record; which is, that they are not to be controverted. But the latter part of the section precludes such understanding, and qualifies the sense in which the former is to be accepted. For, where is the use of congress prescribing, by general laws, the effect of such judgments, or of the proof of them, which is the same thing, (should that be the grammatical construction,) if by full faith and credit absolute verity is intended.
The next question is, does the act of congress prescribe the effect of such judgments ? In terms it certainly does not. On the contrary, it limits and restrains the generality of the first period of the article under consideration, by declaring that such judgments, when authenticated in the manner prescribed, shall be entitled to the same faith and credit in every court within the United States, as they have by law or usage in the courts of the state from whence they are, or shlall be talcen. But admitting the act of congress to be an execution of the power vested in that body by the *601 constitution, it will not, in my ^conception, have [*484] the effect of rendering such judgments conclusive here. It will become necessary to examine their effect in the state in which they are pronounced, and we know that some of them, which are founded on attachments issuing in neighboring states, against absent debtors, are not conclusive in those states. And it certainly never could be intended to give such judgments greater effect here than they would have there. We have had instances also, of process issuing from a court of a neighboring .state being served here, in violation of a positive law of our own state, which we are bound, by such law, to consider as illegal and void.
By pronouncing them conclusive, we should also preclude all inquiry into fraud, which certainly would vitiate them in every state possessing a regularly organized system of jurisprudence.
I cannot, therefore, believe, that a just construction of the constitution and law of the United States will warrant the conclusion, that such judgments are in no case re-examinable in an action founded on them in another state; and, therefore, as we are called upon to pronounce on this question in the abstract, my opinion is, that the verdict be set aside.
"New trial.

 In Massachusetts it has been decided, on demurrer, a bad plea to a judgment in a sister state. Noble v. Gold, Berkshire county, 1 Mass. Will, kep. 410, n.

 The same principle has been recognized in Massachusetts, and that the act of congress does not declare the effect of judgments in sister states. Bartlett v. Knight, 1 Mass. Rep. 401. The consequence necessarily is, that they can be considered only as simple contract debts; Hubbbell v. Cowdry, 5 Johns. Rep. 132, so far, however, established, that matters proper for jury determination, which appear from the record to have been fairly submitted to them, cannot be overhauled; and, indeed, in order to rebut the prima facie evidence they carry with them, the defendant must show their injustice, or, from positive proof, that they have been unfairly or irregularly obtained. Taylor v. Bryden, 8 Johns. Rep. 173. Therefore, if it appear that the judgment proceeded upon, was obtained against an absentee from the state, without any personal summons or notice, as by nailing a declaration against a court-house door, Buchanan v. Bucher, 9 East, 192, or attaching goods, Kilburn v. Woodworth, 5 Johns. Rep. 37, or on a rule, served on the defendant out of the jurisdiction, to show cause why judgment should not go against him, de bonis propriis, Fenton v. Garlich, 8 Johns. Rep. 184, an action cannot be maintained upon it. The only reason why it will support a suit, is the implied assumpsit to pay, which, in the cases above put, the law will not raise. The same rule governs in suits against bail as in those against their principals. Bobinson v. Ex'rs. of Ward, 8 Johns. Rep. 364. But though the foreign judgment be by nil dicit, as the record is “ comes and defends the wrong,” &e., that fact will be presumed to be true, and that the party had notice and appeared. Malony v. Gibbons, 2 Camp. 502. It would seem that in Connecticut a judgment obtained in .another state, after actual or legal notice, cannot be impeached. Smith v. Rhoades, 1 Day’s Cas. in Error, 168
See also Pawling v. Bird's Fx'rs., 13 J. R. 205. But it is now established, that a judgment of a sister state is conclusive and incontrovertible, if the court had jurisdiction not only of the cause, but of the parties also, by the personal service of process, or the appearance of the defendant. See MiUs v. Duryee, 7 Cranch, 481; Borden v. Fitch, 15 J. R. 121; Bissell v. Briggs, 9 Mass. Rep. 462; Shumway v. Stillman, 6 Wend. 447; Andrews v. Montgomery, 19 J. R. 162; Starback v. Murray, 5 Wend. 148; Wheeler v. Raymond, 8 Cow. 311; Thomas v. Robinson, 3 Wend. 267; Bradshaw v. Heath, 13 Wend. 407.