# Supreme Court of Texas

---

No. 23-0756

---

BRP-Rotax GmbH & Co. KG,

*Petitioner*,

v.

Sheema Shaik and Touseef Siddiqui,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

---

JUSTICE BUSBY, joined by Justice Devine, concurring.

I join the Court's opinion, which faithfully applies the law of personal jurisdiction to the facts of this case. But I do so with growing concern about the Supreme Court of the United States' decision to enshrine "fair play" and "reasonableness" as the constitutionally mandated touchstones of personal jurisdiction. These squishy, subjective standards—unmoored from constitutional text and history— have failed on their own terms, producing inconsistent, unpredictable, and thus *un*fair results in factually similar cases brought in different courts. Indeed, this very case would have been decided differently had it been filed in a Texas *federal* court. Jurists, scholars, and

commentators have all written extensively on the problem, but nothing has changed: my colleagues and I must still apply this broken regime ushered in by *International Shoe Co. v. Washington* nearly 80 years ago.[1]

As explained below, the doctrine is unworkable: it yields mixed results in indistinguishable cases, allowing one court to assert personal jurisdiction where another will not. Even worse, the current regime makes it easier for Texas federal courts to exercise personal jurisdiction over nonresident corporate defendants—via the so-called "pure" stream-of-commerce test—than for Texas state courts—which apply the more stringent stream-of-commerce-plus test. All this uncertainty is costly for parties and inefficient for courts.

These difficulties in applying *International Shoe* consistently are the unsurprising result of the Supreme Court's decision to deviate from a deeply rooted historical understanding of courts' power over parties— their jurisdiction to adjudicate. But the tide is shifting: recent scholarship has helped recover the original practice of American courts regarding personal jurisdiction. This practice shows that *International Shoe* went beyond what the Constitution requires: it constitutionalized personal jurisdiction under the banner of "due process" even though that concept alone offers no judicially discoverable or manageable standards for determining jurisdiction. Because this error still haunts courts and

---

[1] 326 U.S. 310 (1945). We are bound to follow U.S. Supreme Court precedent on questions of federal constitutional law. *See* Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 N.Y.U. J.L. & LIBERTY 44, 51 (2019). "[F]idelity to Supreme Court precedent must trump fidelity to text and original public meaning." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 246 (5th Cir. 2022) (Ho, J., concurring).

litigants today and results in federal-versus-state forum splits like the one here, I write separately to urge the Supreme Court to reconsider its approach to personal jurisdiction.

## I

I begin by explaining the Court's current fairness-based approach to constitutional personal jurisdiction and showing that it yields inconsistent and unpredictable results that are unfair on their own terms. This case provides a typical illustration of these problems.

## A

Since *International Shoe*, the Supreme Court of the United States has focused its approach to personal jurisdiction mostly on one guidepost: "general fairness." *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445 (1952).[2] In *World-Wide Volkswagen Corp. v. Woodson*, the Court explained its view of the Due Process Clause as a "guarantor against inconvenient litigation," observing that this "protection . . . is typically described in terms of 'reasonableness' or 'fairness.'" 444 U.S. 286, 292 (1980). Over the decades, many justices writing separately have agreed with this description: the inquiry turns on "fairness" to the

---

[2] True, the Supreme Court's opinions have sometimes considered other principles when discussing personal jurisdiction. *See, e.g.*, *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 879 (2011) (plurality opinion) (sovereign authority of the State); *Calder v. Jones*, 465 U.S. 783, 788 (1984) (convenience to and burden on the parties); *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (individual liberty). But each case eventually reduces to one basic question: is exercising personal jurisdiction over the defendant consistent with "overall principles of fairness"? Richard D. Freer, *Personal Jurisdiction in the Twenty-First Century: The Ironic Legacy of Justice Brennan*, 63 S.C. L. REV. 551, 554 (2012).

defendant.[3]  Equally clear "is what does *not* drive [this analysis]: original meaning."[4]

In assessing "fairness," *International Shoe* and its progeny instruct courts to apply a basic rule taught in 1L Civil Procedure courses across the Nation: "due process requires" that a defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  326 U.S. at 316 (internal quotation marks omitted).  Put slightly differently, there must be "such contacts . . . with the state of the forum as make it reasonable, in the context of our federal system of government, to require [a defendant] to defend a particular suit which is brought there."  *Id.* at 317; *see also id.* (considering whether defense would "lay too great and unreasonable a burden on the [defendant] to comport with due process").

"[O]bvious and necessary though the principle may [have] be[en], it is an abstraction without easy application."  *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 680 (Tex. 2006).  As nearly 80 years of

---

[3] *See, e.g.*, *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 269 (2017) (Sotomayor, J., dissenting) ("A core concern in this Court's personal jurisdiction cases is fairness."); *Nicastro*, 564 U.S. at 903 (Ginsburg, J., dissenting) ("The modern approach to jurisdiction over corporations and other legal entities, ushered in by *International Shoe*, gave prime place to reason and fairness."); *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 427 (1984) (Brennan, J., dissenting) ("[T]he principal focus when determining whether a forum may constitutionally assert jurisdiction over a nonresident defendant has been on fairness and reasonableness to the defendant."); *Ins. Corp. of Ir.*, 456 U.S. at 713-14 (Powell, J., concurring) ("Whenever the Court's notions of fairness are not offended, jurisdiction apparently may be upheld.").

[4] Mila Sohoni, *The Puzzle of Procedural Originalism*, 72 DUKE L.J. 941, 990 (2023).

trying to break in *International Shoe* have revealed, its fairness-based approach to personal jurisdiction fails on its own terms. Scholarly criticism of the doctrine's shortcomings in the modern world and empirical data from judicial decisions agree: using subjective concepts of fairness, reasonableness, and justice to measure personal jurisdiction simply does not work.

In *World-Wide Volkswagen*, the Court stated the doctrine's objective: "[t]he Due Process Clause, by ensuring the orderly administration of the laws, gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." 444 U.S. at 297 (quoting *Int'l Shoe*, 326 U.S. at 319). A few decades later, the Court reiterated that having "[s]imple jurisdictional rules . . . promote[s] greater predictability"; it "is valuable to corporations making business and investment decisions" and "also benefits plaintiffs deciding whether to file suit in a state or federal court." *Hertz Corp. v. Friend*, 559 U.S. 77, 94, 95 (2010).

Unfortunately, the Supreme Court's current fairness-based approach is the opposite of consistent, predictable, and orderly. Legal scholars have recognized for decades that *International Shoe* means "too many things to too many people,"[5] yielding a body of cases that is

---

[5] Stephen E. Sachs, *How Congress Should Fix Personal Jurisdiction*, 108 Nw. U. L. Rev. 1301, 1305 (2014) [hereinafter Sachs, *Fix Personal Jurisdiction*].

"plagued" by "[a]mbiguity and incoherence."[6] This personal-jurisdiction regime breeds inconsistency in the law, leaving litigants guessing what contacts amount to "minimum contacts" and courts unsure whether their exercise of jurisdiction comports with "fair play and substantial justice."[7] Such uncertainty increases litigation costs, incentivizes forum shopping,[8] and consumes more of our scarce judicial resources.

Extensive scholarly research shows that this doctrine has produced confusion among state and federal courts nationwide[9]—nowhere more pervasively, perhaps, than where jurisdiction is predicated on a nonresident defendant's "contacts" with a forum through

---

[6] Kevin C. McMunigal, *Desert, Utility, and Minimum Contacts: Toward a Mixed Theory of Personal Jurisdiction*, 108 YALE L.J. 189, 189 (1998); *see also* Roger H. Trangsrud, *The Federal Common Law of Personal Jurisdiction*, 57 GEO. WASH. L. REV. 849, 850 (1989) ("[T]he Supreme Court . . . has failed to expound a coherent theory of the limits of state sovereignty over noncitizens or aliens.").

[7] *See* Christina Ackemjack, *Federal Personal Jurisdiction: Derailing Corporate-Friendly Litigation*, 4 ST. THOMAS J. COMPLEX LITIG. 41, 41 (2018) (explaining that state courts are uncertain about when jurisdiction is proper given the lack of "clear and predictable rules"); Tracy O. Appleton, *The Line Between Liberty and Union: Exercising Personal Jurisdiction over Officials from Other States*, 107 COLUM. L. REV. 1944, 1990 (2007) ("[A]ll states suffer from the unpredictability of current personal jurisdiction rules."); *see also* Angela M. Laughlin, *This Ain't the Texas Two Step Folks: Disharmony, Confusion, and the Unfair Nature of Personal Jurisdiction Analysis in the Fifth Circuit*, 37 CAP. U. L. REV. 681 (2009) [hereinafter Laughlin, *Texas Two Step*].

[8] *See* Sachs, *Fix Personal Jurisdiction*, at 1307 ("The more malleable the doctrine, the broader the forum shopping opportunities of highly sophisticated plaintiffs, who can select courts with plaintiff-friendly judges, juries, procedures, or choice of law.").

[9] *See* Laughlin, *Texas Two Step*, at 727 app. A.

the internet.[10]   Different States' courts are divided on the correct standard to apply in deciding whether a corporate defendant has "minimum contacts" with the forum,[11] as are federal circuit courts across the Nation.[12]  Even more troubling, state courts and the federal circuits that include those States have split on what standard to apply, as this case shows.[13]

---

[10] *See* Bryce A. Lenox, *Personal Jurisdiction in Cyberspace: Teaching the Stream of Commerce Dog New Internet Tricks:* Compuserve, Inc. v. Patterson, *89 F.3d 1257 (6th Cir. 1996)*, 22 U. DAYTON L. REV. 331, 345 n.129 (1997); Renaud Sorieul et al., *Establishing a Legal Framework for Electronic Commerce: The Work of the United Nations Commission on International Trade Law (UNCITRAL)*, 35 INT'L LAW. 107, 121 (2001) (discussing conflicting outcomes on substantially similar facts among courts where personal jurisdiction is based on internet-related contacts with forums).

[11] *See* Laughlin, *Texas Two Step*, at 727 app. A (demonstrating how different States apply different standards—*i.e.*, some apply "pure" stream of commerce, others require "plus," and a few apply an unclear hybrid standard).

[12] *Compare Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 472, 479-480 (6th Cir. 2003) (following stream-of-commerce-*plus* test), *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945-46 (4th Cir. 1994) (same), *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 683 (1st Cir. 1992) (same), *and Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (same), *with Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613-15 (8th Cir. 1994) (following "*pure*" stream-of-commerce test), *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 420 (5th Cir. 1993) (same), *and Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992) (same).  Some federal circuits have refused to choose a side.  *See, e.g.*, *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 620 (10th Cir. 2012); *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993); *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999); *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995); *Renner v. Lanard Toys Ltd.*, 33 F.3d 277 (3d Cir. 1994).  But most of the States within those circuits have selected one governing standard.  *See* Laughlin, *Texas Two Step*, at 727 app. A.

[13] *See* Laughlin, *Texas Two Step*, at 727 app. A (illustrating conflicts between federal circuit courts and States within those circuits).

The Supreme Court not only has allowed these conflicts to persist, it has also facilitated their growth by producing a string of plurality and closely divided decisions.[14]  Even in *Ford Motor Co. v. Montana Eighth Judicial District Court* (one of the Court's recent attempts at untangling the doctrine) there was fair-minded disagreement on what the majority's opinion meant.[15]  "It is a perilous project [for lower courts] to interpret a Supreme Court [doctrine] that *the Justices themselves* interpret differently." *Ethridge v. Samsung SDI Co.*, 137 F.4th 309, 317 (5th Cir. 2025) (Oldham, J.).

These signals all point in the same direction: courts are doing their level best to apply a flawed doctrine.  And "[t]he impact of these differing approaches is clear: disharmony and unpredictability."[16]  The Court's approach to personal jurisdiction should be "rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court."  *Hanna v. Plumer*, 380 U.S. 460, 467 (1965).  But the current doctrine does no such thing: far from "discourag[ing] . . . forum-shopping," *id.* at 468, it instead "render[s] impossible [the] equal

---

[14] *See, e.g.*, *Mallory v. Norfolk So. Ry.*, 600 U.S. 122 (2023) (partial plurality opinion); *Nicastro*, 564 U.S. at 883 (plurality opinion); *Burnham v. Super. Ct. of Cal.*, 495 U.S. 604 (1990) (plurality opinion); *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987) (plurality opinion); *World-Wide Volkswagen*, 444 U.S. at 286 (plurality opinion).

[15] *Compare Ford*, 592 U.S. at 373 (Alito, J., concurring), *with id.* at 375-78 (Gorsuch, J., concurring).

[16] Laughlin, *Texas Two Step*, at 712.

8

protection of the law," *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 75 (1938).[17]

**B**

I can think of no better illustration of the problem than the aspect of personal jurisdiction at issue here: the stream-of-commerce doctrine. Our journey through this doctrinal labyrinth begins with the Supreme Court's decision in *World-Wide Volkswagen*. After purchasing a car in New York, the Robinsons embarked on a cross-country trip to their new Arizona home. While passing through Oklahoma, they were involved in an accident. The Robinsons sued (among others) the car's regional distributor, World-Wide, and its New York retailer in Oklahoma state court, alleging various products-liability claims. Contrary to its name, World-Wide contended that exercising jurisdiction over it would violate due process, but the Oklahoma courts disagreed. The U.S. Supreme Court reversed. Considering "the apparent paucity of contacts between [World-Wide] and Oklahoma," 444 U.S. at 289, the Court held that Oklahoma's exercise of jurisdiction would offend principles of "reasonableness or fairness," *id.* at 292, as World-Wide did not "deliver[]

---

[17] *Erie*, of course, curtailed federal common law. But the principles underlying *Erie*—its "twin aims," *see Hanna v. Plumer*, 380 U.S. 460, 467 (1965)—apply with great force in requiring procedural fairness here too. As explained below, where entry into federal court is easier than entry into state court—especially when the courts are within the same federal circuit—plaintiffs are incentivized to forum shop and the law is necessarily inequitable in opening the courthouse gates. Although the Court's personal-jurisdiction precedent currently permits that inequity, the Constitution and the practical underpinnings of the Court's related doctrines surely do not.

its products into the stream of commerce with the expectation that they [would] be purchased by consumers in the forum State," *id.* at 298.

Not even a decade later, the Court was presented with another opportunity to address the stream-of-commerce theory in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987) (plurality opinion). After an allegedly defective tire caused a fatal car collision, the plaintiffs sued a Taiwanese manufacturer that filed a cross-complaint against Asahi, a Japanese corporation. Asahi's contacts with the United States were limited: its manufacturing occurred in Japan and its products' arrivals here were indirect, occurring mostly through the Taiwanese manufacturer's sales. Even if it did not directly target the United States, testimony showed Asahi knew very well that its products would end up here. The Court granted certiorari to decide

> whether the mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes "minimum contacts" between the defendant and the forum State such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"

*Id.* at 105 (quoting *Int'l Shoe*, 326 U.S. at 316).

Writing for a plurality, Justice O'Connor answered "no": mere awareness could not serve as a basis for jurisdiction unless some further action was taken—the minimum contacts "must come about by *an action of the defendant purposefully directed toward the forum State.*" *Id.* at 112. "The placement of a product into the stream of commerce, without more," the plurality held, is not such a purposefully directed act;

10

"[a]dditional conduct" indicating an intent or purpose to serve the market is required. *Id.*

Justice Brennan concurred in the judgment, disagreeing with the plurality's reasoning and seeing no need for a showing of "additional conduct" indicating an intent or purpose to serve the forum. *Id.* at 117 (Brennan, J., concurring). Instead, he viewed the stream of commerce as referring not "to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.*[18]

Since *Asahi*, "[t]he rules and standards for determining when a State does or does not have jurisdiction over an absent party have been unclear." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877 (2011) (plurality opinion). Lower "courts have sought to reconcile the competing opinions," *id.* at 883, and so has the Supreme Court. Just over a decade ago in *Nicastro*, for example, the Court again tried to offer guidance on which approach—Justice O'Connor's or Justice Brennan's—better applied to the "decades-old questions left open in *Asahi*." *Id.* at 877. But to no avail—again, a plurality agreed with Justice O'Connor's "plus" approach, *id.* at 883, while their colleagues preferred Justice Brennan's approach, *id.* at 903-05 (Ginsburg, J., dissenting). Several

---

[18] Justice Stevens also concurred, arguing the plurality's creation of an "intent or purpose" test was unnecessary to decide the case. *Asahi*, 480 U.S. at 121 (Stevens, J., concurring).

11

scholars have criticized the split of authority.[19]  And various courts attempting to apply the governing stream-of-commerce doctrine have reached opposite holdings in different jurisdictions on similar facts.[20]

We are left today with just as many questions as before.  Courts across the Nation have chosen inconsistent approaches to this stream-of-commerce conundrum: some apply a "pure" standard based on foreseeability while others require a "plus."  Nowhere is this inconsistency more vividly on display than in the approach taken and reasoning used in Texas federal and state courts.

---

[19] *See, e.g.*, Robert C. Casad, *Personal Jurisdiction in Federal Question Cases*, 70 TEX. L. REV. 1589, 1593 (1992) (explaining how lack of clarity in stream-of-commerce theory yields confusion, inconsistent holdings, and unpredictable results); Erik T. Moe, Comment, Asahi Metal Industry Co. v. Superior Court: *The Stream of Commerce Doctrine, Barely Alive but Still Kicking*, 76 GEO. L.J. 203, 213-15 (1987) (discussing cases that reach opposite holdings on similar facts given Supreme Court's conflicting guidance on stream-of-commerce theory).

[20] *Compare Gavigan v. Walt Disney World, Inc.*, 646 F. Supp. 786, 787-88 (E.D. Pa. 1986) (subject to jurisdiction for actively soliciting clientele in the forum), *Walker v. Carnival Cruise Lines*, 681 F. Supp. 470, 476 (N.D. Ill. 1987) (same), *and Oliff v. Kiamesha Concord, Inc.*, 254 A.2d 330, 333 (N.J. Super. Ct. Law Div. 1969) (same), *with Whalen v. Walt Disney World Co.*, 418 A.2d 389, 392 (Pa. Super. Ct. 1980) (not subject to jurisdiction for similar contacts), *Dirks v. Carnival Cruise Lines*, 642 F. Supp. 971, 975 (D. Kan. 1986) (same), *and Miller v. Kiamesha-Concord, Inc.*, 218 A.2d 309, 311 (Pa. 1966) (same). *Compare also Volkswagenwerk, A. G. v. Klippan GmbH*, 611 P.2d 498, 511 (Alaska 1980) (permitting jurisdiction under stream-of-commerce theory over German car-seat manufacturer because manufacturer designed, manufactured and sold product to company knowing it would market product throughout the United States), *with Humble v. Toyota Motor Co.*, 727 F.2d 709, 710 (8th Cir. 1984) (rejecting jurisdiction under stream-of-commerce-plus theory over Japanese car-seat manufacturer on similar facts because suit in forum was only foreseeable).

The U.S. Court of Appeals for the Fifth Circuit follows the "stream-of-commerce" approach to personal jurisdiction, "under which the minimum contacts requirement is met so long as the court 'finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state.'" *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (quoting *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987)). In applying that test, "mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce." *Luv n' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006) (cleaned up). But "the defendant's contacts must be more than 'random, fortuitous, or attenuated, or . . . the unilateral activity of another party or third person.'" *Ainsworth*, 716 F.3d at 177 (internal citation omitted); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Texas federal district courts have attempted to follow this approach faithfully.[21]

---

[21] *See, e.g.*, *ATEN Int'l Co. v. Emine Tech. Co.*, 261 F.R.D. 112, 118-121 (E.D. Tex. 2009); *Sunshine Kids Found. v. Sunshine Kids Juv. Prods., Inc.*, No. H-09-2496, 2009 WL 5170215 (S.D. Tex. Dec. 18, 2009); *Ritzmann v. Nalu Kai, Inc.*, 523 F. Supp. 2d 564 (S.D. Tex. 2007); *Animale Grp., Inc. v. Sunny's Perfume, Inc.*, No. 5:07-cv-13, 2007 WL 760373 (S.D. Tex. Mar. 8, 2007); *Philip Morris USA, Inc. v. Lee*, No. EP-05-CV-490-PRM, 2006 WL 4659839 (W.D. Tex. Dec. 28, 2006); *Sorkin v. Dayton Superior Corp.*, No. H-06-1318, 2006 WL 2141255 (S.D. Tex. July 28, 2006); *Biggs v. Bass Pro Outdoor World, LLC*, No. 304CV1920R, 2005 WL 1511129 (N.D. Tex. June 27, 2005).

This Court, on the other hand, has adopted the *Asahi* plurality's approach, endorsing the so-called stream-of-commerce-plus test.[22] *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) ("[O]ur precedent generally follows Justice O'Connor's plurality opinion in *Asahi*, which requires some 'additional conduct'—beyond merely placing the product in the stream of commerce—that indicates 'an intent or purpose to serve the market in the forum State.'"); *see also In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 677 (Tex. 2022). Our courts of appeals have attempted to apply this theory faithfully,[23] and this Court applies it faithfully today. *Ante* at 8-10.

Given this division between Texas state and federal courts, whether a court in Texas has personal jurisdiction over Rotax depends on where the case is filed: state court or federal court. As the Court

---

[22] Only 20 years ago, the question whether "plus" was required for personal jurisdiction in Texas state courts remained unclear. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 786 (Tex. 2005) ("Whichever of these standards is ultimately correct, [the defendant]'s conduct meets none of them.").

[23] Unfortunately, given the prevailing confusion regarding the "fairness" analysis of personal jurisdiction and the stream-of-commerce concept specifically, these faithful attempts are sometimes unsuccessful. *See, e.g.*, *Hyundam Indus. Co. v. Swacina*, No. 24-0207, ___ S.W.3d ___, slip op. at ___ (Tex. June 20, 2025); *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 350 (Tex. 2023) (noting "multiple decisions of our courts of appeals . . . involving factually similar claims . . . yielding seemingly conflicting conclusions about whether personal jurisdiction exists" under stream-of-commerce-plus test); *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 417 (Tex. 2023) (reversing court of appeals' judgment and holding Texas court had personal jurisdiction over German manufacturer in case not "involv[ing] a typical stream-of-commerce scenario").

14

explains, Texas state courts cannot exercise personal jurisdiction over Rotax under the stream-of-commerce-plus theory. *Ante* at 10, 22.

But a Texas federal court surely could under the pure stream-of-commerce theory. Plaintiffs allege and the record confirms that Rotax, an Austrian manufacturer of airplane engines for markets worldwide, placed an allegedly defective airplane engine into the stream of commerce with the knowledge that it could reach the Texas market. Specifically, Rotax created, controlled, and employed a network of authorized independent distributors to sell its engines. It entered into a distribution agreement with Kodiak, and Texas is in the territory that the agreement requires Kodiak to serve. Hundreds of Rotax engines are registered in Texas, and the record shows that the engine at issue here traveled through the stream of commerce from Rotax to Texas through Kodiak and one of its sub-distributors. Rotax also authorized Kodiak to create centers to service, repair, and fulfill Rotax's warranty obligations on Rotax engines. Kodiak established such a center in Bulverde, Texas, and Rotax is required to reimburse Kodiak for warranty claims made through the center. Because this evidence shows Rotax "delivered [engines] into the stream of commerce with the expectation that [they] would be purchased by or used by consumers in [Texas]," a federal court in Texas would have specific personal jurisdiction over Rotax. *Bearry,* 818 F.2d at 374; *see also Luv n' care*, 438 F.3d at 470 (requiring "mere foreseeability or awareness" that product will enter forum state while in stream of commerce). Nothing in this Court's opinion today is to the contrary.

\* \* \*

15

If "fairness" is to be our constitutional north star in determining personal jurisdiction, as the Supreme Court has directed, this result surely shows we have been led astray. Today's holding—that the U.S. Constitution does not permit personal jurisdiction over Rotax, a holding that directly results from *International Shoe*'s fairness-based scheme— allows plaintiffs suing in Texas to invoke the jurisdiction of a federal court over a defendant when they could not do so in state court. Unless we revisit what the Constitution requires, anomalies like this one will continue confusing lower courts and litigants alike.

## II

It should come as no surprise that state and federal courts in Texas have broken from each other on the stream-of-commerce test, and that *International Shoe* has proven difficult to apply in a predictable, even-handed fashion. As many courts and scholars have explained, the existing fairness-based approach is unmoored from our Constitution's text and history.[24] In particular, nothing in the text or history of the Due Process Clause of the Fourteenth Amendment provides an objective basis for determining when an exercise of personal jurisdiction over a foreign corporate defendant would be "unfair"—for example, whether that clause requires the stream of commerce to have a "plus." Instead,

---

[24] *See, e.g.*, *Ethridge v. Samsung SDI Co.*, 137 F.4th 309, 323 (5th Cir. 2025) (Oldham, J.) ("The doctrine does not come from constitutional text or original law."); Lawrence B. Solum & Max Crema, *Originalism and Personal Jurisdiction: Several Questions and a Few Answers*, 73 ALA. L. REV. 483, 486 (2022) [hereinafter Solum & Crema, *Originalism and Personal Jurisdiction*] ("[I]t seems very unlikely that *International Shoe*'s 'fair play and substantial justice' standard can be grounded in the original meaning of the 1868 text.").

16

I urge the Supreme Court to consider the guidance provided by early American practice regarding personal jurisdiction, which supports a sovereignty-based approach rooted in principles of customary law governing jurisdiction to adjudicate.

## A

"The one thing jurisdiction scholars agree on is the sad state of personal jurisdiction law."[25] For the most part, attacks on *International Shoe* have focused on the Court's inability to speak with one voice on when a forum's exercise of jurisdiction will comport with "fair play and substantial justice."[26] Instead, the Court has offered a potpourri of "catchphrases and buzzwords"[27]—*i.e.*, "minimum contacts," "substantial justice," "fair warning," "purposeful availment," and "reasonableness"— that are detached from early American personal-jurisdiction practice. *See Burger King*, 471 U.S. at 472-78. And it has sent conflicting signals regarding the importance of particular considerations, such as the

---

[25] Sachs, *Fix Personal Jurisdiction*, at 1304.

[26] *See* James Weinstein, *The Federal Common Law Origins of Judicial Jurisdiction: Implications for Modern Doctrine*, 90 VA. L. REV. 169, 171 (2004) ("Although the extensive body of commentary on federally imposed limitations of state court jurisdiction agrees on very little, the one point of consensus is that Supreme Court personal jurisdiction doctrine is deeply confused."); James P. George, *Running on Empty:* Ford v. Montana *and the Folly of Minimum Contacts*, 30 GEO. MASON L. REV. 1, 5 (2022) (calling personal jurisdiction doctrine "an unworkable maze of a test whose precedents are a repetitive patchwork of contradictions").

[27] Allan Erbsen, *Impersonal Jurisdiction*, 60 EMORY L.J. 1, 3 (2010).

burden on the defendant[28] and the plaintiff's interest in a convenient forum.[29]   Volatility and inconsistency in providing a single, constitutionally rooted focus has left lower courts scrambling to find a true "touchstone" in this analysis.  "[W]e should endeavor to make the law simpler, not more byzantine." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 249 (5th Cir. 2022) (Ho, J., concurring).

Calls to discard *International Shoe*'s regime have also come from its creator—the Supreme Court.  The first objection to a fairness-based doctrine of jurisdiction came from Justice Black in *International Shoe* itself.  After a majority of the *International Shoe* Court held that "fair play," "justice," and "reasonableness" applied whenever personal jurisdiction was involved, Justice Black wrote separately to emphasize the danger *International Shoe* posed to "our federative system of government." 326 U.S. at 323 (opinion of Black, J.).  *International Shoe*'s reasoning, he explained, "introduced uncertain elements confusing the simple pattern and tending to curtail the exercise of State powers to an extent not justified by the Constitution." *Id.*  He saw no basis for "stretch[ing] the meaning of due process so far as to authorize this Court to deprive a State of the right to afford judicial protection to its citizens

---

[28] *Compare Kulko v. Super. Ct. of Cal.*, 436 U.S. 84, 97 (1978) (holding burden too great where East Coast resident forced to litigate on the West Coast), *with Calder*, 465 U.S. at 789-790 (holding burden not too great where East Coast resident forced to litigate on the West Coast).

[29] *Compare McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (emphasizing plaintiff's interest in suing out-of-state defendant in convenient local forum), *with Kulko*, 436 U.S. at 100 n.15 (deemphasizing plaintiff's interest in suing defendant in convenient local forum).

on the ground that it would be more 'convenient' for the corporation to be sued somewhere else." *Id.* at 325.

Moreover, Justice Black foresaw what *International Shoe* threatened to become:

> I believe that the Federal Constitution leaves to each State, without any 'ifs' or 'buts', a power to tax and to open the doors of its courts for its citizens to sue corporations whose agents do business in those States. Believing that the Constitution gave the States that power, I think it a judicial deprivation to condition its exercise upon *this Court's notion* of 'fairplay', however appealing that term may be.

*Id.* at 324-25 (emphasis added). He explained that a test focused on "reasonableness, justice, or fair play, makes judges the supreme arbiters of the country's laws and practices," while the Constitution and our oath to preserve it require a less judge-centric approach. *Id.* at 326.[30] As Justice Black's prophecy has come true, more judges are questioning whether *International Shoe* and its progeny should be revisited.

Just a few Terms ago, for example, Justice Gorsuch expressed his skepticism about the Court's "personal jurisdiction jurisprudence and *International Shoe*'s increasingly doubtful dichotomy." *Ford Motor*, 592 U.S. at 384 (Gorsuch, J., concurring). After a majority of the Court added another chapter to the already confusing *International Shoe* saga, Justice Gorsuch took the occasion to explain why another chapter had become necessary: "because the old [*International Shoe*] test no longer

---

[30] *See* Solum & Crema, *Originalism and Personal Jurisdiction*, at 485 ("*International Shoe*'s adoption of the minimum-contacts and fairness standard as the test for compliance with the Due Process of Law Clauses is a paradigm case of living constitutionalism.").

seems as reliable a proxy for determining corporate presence as it once did." *Id.* at 382-83. *International Shoe* offered "a heady promise," but all the Court has done since, Justice Gorsuch explained, "is struggle for new words to express the old ideas." *Id.* Instead, Justice Gorsuch suggested that the Court should "seek to answer the right question— what the Constitution as originally understood requires, not what nine judges consider 'fair' and 'just.'" *Id.* at 379 n.2.

Implicit in Justice Gorsuch's criticism is the reality that *International Shoe*'s attempt to "modernize" the doctrine of personal jurisdiction in response "to the fundamental transformation of our national economy" has not worked as expected. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222 (1957). Shortly after *International Shoe*, the Court explained that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Id.* at 223.[31] And that burden has only continued to decrease,[32] especially for larger corporations.[33] Yet many corporations doing business nationwide have sensibly structured their affairs to minimize jurisdiction under

---

[31] *See also Frene v. Louisville Cement Co.*, 134 F.2d 511, 516 (D.C. Cir. 1943) (Rutledge, J.) ("In general the trend has been toward a wider assertion of power over nonresidents and foreign corporations. . . .").

[32] *See World air passenger traffic evolution, 1980-2020*, INT'L ENERGY AGENCY, https://www.iea.org/data-and-statistics/charts/world-air-passenger-traffic-evolution-1980-2020 (showing how during the 1980s, world air-passenger traffic was less than a billion passengers annually, but how recently the number has reached nearly five billion yearly passengers).

[33] John F. Coyle, *Financial Hardship and Forum Selection Clauses*, 103 N.C. L. REV. 641, 646 (2025) ("When a wealthy corporation is directed to litigate in a distant forum, it will typically have the resources to do so.").

*International Shoe*[34]—consenting to all-purpose jurisdiction in their "home" state, *see Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014), while limiting their exposure to personal jurisdiction in other States under the fairness-based minimum-contacts rubric.[35] Small businesses are less likely to be able to afford such structuring, yet it is they who face a greater burden when called upon to defend themselves in remote States.[36]

Another oddity of *International Shoe* is that foreign corporations like Rotax receive more protection under the Due Process Clause than foreign individuals, and more protection than under other provisions of the Constitution. The U.S. Supreme Court has been abundantly clear: "it is long settled as a matter of American constitutional law that foreign citizens outside U. S. territory do not possess rights under the

---

[34] Only two Terms ago, a plurality of the Supreme Court revisited part of its doctrine concerning corporations and personal jurisdiction. *See Mallory*, 600 U.S. 122. Now, in States where there is a consent-by-registration statute on the books, a corporation is said to have consented to personal jurisdiction in that forum as a condition for doing business there—think something akin to "tag" jurisdiction for individuals. But outside this context, *International Shoe* remains alive and well. *Id.* at 146 n.11 ("*International Shoe* governs where a defendant has not consented to exercise of jurisdiction.").

[35] Robert H. Jackson, *What Price "Due Process?"* 5 N.Y. L. REV. 435, 436 (1927) (explaining how corporations invoke their foreign charter when confronted with personal jurisdiction, enjoying the forum's economic benefits while avoiding liability there).

[36] For example, a family business operating out of a Texas home and selling on eBay might be subjected to nationwide jurisdiction under the "pure" stream-of-commerce test solely because it foresaw its product reaching another forum. But it is for these small enterprises that nationwide jurisdiction is most "unfair" from a burden standpoint. *See* Peter L. Markowitz & Lindsay C. Nash, *Constitutional Venue*, 66 FLA. L. REV. 1153, 1209 (2014).

U. S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020). This principle includes foreign corporations: "foreign organizations operating abroad," as well as "foreign affiliates" of domestic corporations, "possess no rights under the First Amendment." *Id.* at 436. Even in criminal cases, where life and liberty may be at stake, foreign citizens abroad cannot claim constitutional protections. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990) (Fourth Amendment); *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (Fifth Amendment). Several scholars have explained that this principle logically extends to the personal-jurisdiction context.[37]

Given this precedent, should a separate foreign corporation that has structured its activities to benefit from the U.S. market without entering the country directly be able to invoke constitutional limits on the jurisdiction of American courts in a civil suit for harm caused by its product? As just explained, "[t]he American Constitution exists primarily to secure the rights of Americans." *Douglass*, 46 F.4th at 281 (Elrod, J., dissenting). Constitutional limits on personal jurisdiction

---

[37] Aaron D. Simowitz, *Legislating Transnational Jurisdiction*, 57 VA. J. INT'L L. 325, 351 (2018) ("The right of foreign defendants to benefit from the protections of . . . [d]ue [p]rocess personal jurisdiction is unclear."); Lea Brilmayer & Matthew Smith, *The (Theoretical) Future of Personal Jurisdiction: Issues Left Open by* Goodyear Dunlop Tires v. Brown *and* J. McIntyre Machinery v. Nicastro, 63 S.C. L. REV. 617, 633 (2012) (granting foreign defendants due-process protections is "both highly controversial and contrary to other Supreme Court precedent" in other contexts); Austen L. Parrish, *Sovereignty, Not Due Process: Personal Jurisdiction over Nonresident Alien Defendants*, 41 WAKE FOREST L. REV. 1, 33 (2006) [hereinafter Parrish, *Not Due Process*] (arguing foreign private defendants should not be granted due-process protections in the personal-jurisdiction context).

would not apply if the corporation were charged criminally or if a foreign individual sent a harmful product into the country, and such a corporation cannot claim other important constitutional protections. Yet every relevant Supreme Court decision has assumed that foreign corporations are protected from undesirable litigation in the United States as a matter of due process—without offering any reason why.

Several judges have called this discontinuity into question. Now-Chief Judge Elrod recently criticized the contradiction between demanding the right to stay at home abroad while claiming the due process rights that belong to those at home in the United States. *See id.* Citing to *Asahi* and discussing its application to foreign corporations, Judge Williams has urged that "it may be valuable for courts to reconsider both the merits of the assumption in *Asahi Metal* and kindred cases that private foreign corporations deserve due process protections." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 819 (D.C. Cir. 2012) (Williams, J., concurring). And a D.C. Circuit panel, just a few decades earlier, expressed the same sentiment in an opinion by Judge Randolph: "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999). Many scholars have agreed, arguing that foreign corporations generally have no entitlement to due-process protections as an originalist matter.[38] "To the extent that the Constitution is a social

---

[38] *See* Parrish, *Not Due Process*, at 33-34 ("Several academics have convincingly argued that the Framers never intended [the Due Process Clauses of the Fifth or Fourteenth Amendment] to limit territorial assertions of power

contract establishing a system of self-government, permanent outsiders . . . seem to have little claim to invoke constitutional 'rights.'"[39]

I discuss these difficulties and debates not to venture an opinion on how they should be resolved but instead to suggest that the very difficulties themselves indicate it is time for the Supreme Court to reexamine the fairness-based approach to personal jurisdiction that gives rise to them. As I explain next, consulting our history and tradition reveals a very different relationship between the Constitution and limits on courts' personal jurisdiction over defendants.

## B

To no part of the Constitution can one trace *International Shoe* and its progeny. Considering the Due Process Clauses' text and history, nothing there offers an objective basis for determining when an exercise of personal jurisdiction would be "fair" to a foreign corporate defendant.

Almost a century after the American Founding, courts assessing personal jurisdiction over a defendant began asking a novel question: whether the exercise of personal jurisdiction in a given case comported with due process. Courts today automatically associate restrictions on the assertion of personal jurisdiction with due process. But why? What constitutional role could due process play in imposing nonprocedural limits on the scope of a court's personal jurisdiction? And are courts

---

even in the domestic context," and the "logic applies with greater force when the case involves a foreign defendant.").

[39] Lori Fisler Damrosch, *Foreign States and the Constitution*, 73 VA. L. REV. 483, 487 (1987).

correct in automatically associating personal jurisdiction with due process without constitutional support on point?

From an originalist perspective, the phrase "due process" provides no basis for divining territorial limits that can be used to answer questions of personal jurisdiction.[40] Limits on a court's personal jurisdiction over a defendant have always existed;[41] their connection to constitutional due process has not. As one scholar has explained, "[w]hen American courts first began articulating limits on personal jurisdiction, they didn't look to state or federal due process clauses, but to rules of general or international law that regulated the authority of separate sovereigns."[42]

"States that wanted to exercise broad jurisdiction would do so, and would execute judgments within their borders on as much of the defendant's property as they could find."[43] These judgments were entitled to full faith and credit in other States, but only to the extent

---

[40] *See* Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 VA. L. REV. 1703 (2020) [hereinafter Sachs, *Unlimited Jurisdiction*]; *see also* Stephen E. Sachs, Pennoyer *Was Right*, 95 TEX. L. REV. 1249 (2017) [hereinafter Sachs, Pennoyer *Was Right*].

[41] Before *Pennoyer*, these limits on state judgments, as a matter of customary law, simplified into one question: "whether anyone else would listen to them." Sachs, Pennoyer *Was Right*, at 1274; *see, e.g.*, *Hart v. Granger*, 1 Conn. 154, 168-69 (1814) (holding that if defendant is "so within the jurisdiction of the court," "they can be *commanded*" "to appear and answer").

[42] Sachs, *Unlimited Jurisdiction*, at 1708-09. *See, e.g.*, *Hitchcock v. Aicken*, 1 Cai. 460, 481 (N.Y. Sup. Ct. 1803) (opinion of Kent, J.); *id.* at 478 (opinion of Radcliff, J.); *accord Picket v. Johns*, 16 N.C. (1 Dev. Eq.) 123, 131 (1827) (opinion of Henderson, J.).

[43] Sachs, Pennoyer *Was Right*, at 1270.

they complied with customary law and international conventions,[44] which focused on "a state's sovereign power over persons or property within its territory."[45] Within this practice, constitutional principles of due process played an indirect and procedural role, limiting enforcement of judgments rendered without personal jurisdiction according to substantive customary limits on the sovereign's jurisdiction to adjudicate. Defendants could challenge a judgment's enforcement through "remov[al of] their cases into federal court or . . . through diversity suits."[46] There, "[a] judgment without jurisdiction was void, and it wouldn't count as 'due process of law' to" enforce such a judgment depriving the defendant of life, liberty, or property.[47]

Following *Pennoyer v. Neff*, 95 U.S. 714 (1878), American courts began rooting personal jurisdiction in due process. But *Pennoyer* did not hold that the Constitution itself dictated substantive limits on personal

---

[44] *See, e.g.*, *Hall v. Williams*, 23 Mass. (6 Pick.) 232, 238 (1828) (holding "principles of the common law" applying "to judgments of the tribunals of foreign countries" were still just as applicable "to the judgments of the courts of the several States when sought to be enforced").

[45] Sachs, Pennoyer *Was Right*, at 1287.

[46] *Id.*

[47] Sachs, *Unlimited Jurisdiction*, at 1722-23. Professor Sachs' argument fits squarely within the doctrine articulated in *Erie*: although state and federal courts could disagree on the content of general law prior to *Erie*, *see Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 18-19 (1842), "they couldn't disagree any longer about personal jurisdiction, because due process issues were subject to federal-question review on direct appeal." Sachs, *Unlimited Jurisdiction*, at 1725.

jurisdiction.[48]  Instead, *Pennoyer* simply recognized what the then-new Due Process Clause of the Fourteenth Amendment had done: "creat[ed] an obligation for state courts—one that hadn't existed before [*Pennoyer*]—to follow the federal courts' lead on questions of personal jurisdiction" as a matter of cooperative federalism.[49]  Both federal and state courts were still looking to traditional territorial rules of personal jurisdiction—not to the Constitution itself—to answer those questions, however.  In other words,

> The Fourteenth Amendment changed th[e] picture for state courts, because it enabled direct federal-question review of their jurisdictional rulings: as *Pennoyer* explained, "proceedings in a court of justice to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law."[50]

This view finds strong support in *Pennoyer* itself.  There, the Court held that an Oregon state court lacked jurisdiction over a nonresident defendant.  But nothing in the Due Process Clause inspired that holding: instead, *Pennoyer* rooted it in principles of sovereignty derived from customary law that had existed for centuries.  Courts long held that a forum's "attempt to give ex-territorial operation to its laws, or to enforce . . . ex-territorial jurisdiction by its tribunals, would be deemed an encroachment upon the *independence of the State* in which

---

[48] Wendy Collins Perdue, *What's "Sovereignty" Got to Do with It? Due Process, Personal Jurisdiction, and the Supreme Court*, 63 S.C. L. REV. 729, 732 (2012) (viewing due process as a "hook" for exercising jurisdiction); Sachs, Pennoyer *Was Right*, at 1288.

[49] Sachs, Pennoyer *Was Right*, at 1288-89.

[50] Sachs, *Unlimited Jurisdiction*, at 1709 (quoting *Pennoyer*, 95 U.S. at 733).

the persons are domiciled or the property is situated." *Pennoyer*, 95 U.S. at 723 (emphasis added).

What due process meant in this context, as *Pennoyer* reaffirmed, was that an "exertion of power affecting private rights" can occur only through "a course of legal proceedings [that] accord[] to those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights." *Id.* at 733. In the era of *Pennoyer*, those rules and principles required that a defendant "be brought within [the State's] jurisdiction by service of process within the State, or [the defendant's] voluntary appearance." *Id.* The Oregon state court's exercise of jurisdiction did not comport with those customs, so the Supreme Court decided that the judgment sought to be enforced was invalid and not constitutionally recognizable.

One benefit of not constitutionalizing substantive limits on personal jurisdiction, as Justice Story recognized long ago, is that they can be adjusted by the politically accountable branches as times change. Should Congress and the President conclude that customary limits on courts' jurisdiction to adjudicate are out of step with the modern world, they would retain the power to change the applicable rules by statute. *See Picquet v. Swan*, 19 F. Cas. 609 (C.C.D. Mass. 1828) (No. 11,134) (Story, J.) (explaining that general jurisdictional principles, which kept with the law of nations, applied unless Congress clearly and expressly legislated otherwise).[51]

---

[51] As Justice Story further explained, Congress could authorize unlimited federal-court jurisdiction by acting clearly enough, and if Congress did so, "the court would certainly be bound to follow it." *Picquet v. Swan*, 19 F. Cas. 609, 615 (C.C.D. Mass. 1828) (No. 11,134).

In sum, the text of the Due Process Clauses offers no guidance on what constitutes a "stream of commerce." And as a historical matter, the Constitution always permitted American courts—state and federal—to rely on customary principles of sovereignty in assessing personal jurisdiction, as demonstrated by the common practice near the time of the Founding and nearly a century thereafter. True, the current regime ushered in under *International Shoe* has existed for almost 80 years, and uprooting it to restore the early American tradition would surely create new questions that courts would be left to answer. But perhaps not: "*Pennoyer*'s reasoning can be right without *International Shoe*'s outcome being wrong; international law and American practice might just be different now than they were in 1878 or 1945."[52]

\*    \*    \*

So where do we go from here? As far as I can tell, the Supreme Court's decision in *Mallory v. Norfolk Southern Railway Co.* was a step in the right direction. 600 U.S. 122 (2023). That case revived—or, more correctly put, reaffirmed—an early American court practice of exercising jurisdiction over corporations through consent-by-registration statutes. *See id.* at 137. But as long as *International Shoe*'s ahistorical appeal to "fairness" remains, the doctrine will continue to befuddle judges and bedevil parties with an eye-of-the-beholder quality that the Supreme Court has, despite its best efforts, failed to tame.

I encourage the Supreme Court to consider returning the personal-jurisdiction inquiry to the touchstone *Pennoyer* identified:

---

[52] Sachs, Pennoyer *Was Right*, at 1250.

sovereign power. The Fourteenth Amendment's role under this originalist approach is simple: channeling federal-question review of a state court's exercise of personal jurisdiction to ensure compliance with traditional limits on sovereignty. Courts would not look to the Constitution to give content to these prevailing limits on when a sovereign's courts can exercise jurisdiction to adjudicate. Instead, courts would take guidance from the customary law regarding territorial rules of personal jurisdiction. I hope the cobbler will soon take *International Shoe* and its fairness-based regime back to the workshop to consider such an originalist "resoling."[53]

J. Brett Busby
Justice

**OPINION FILED:** June 20, 2025

---

[53] Donald L. Doernberg, *Resoling* International Shoe, 2 TEX. A&M L. REV. 247 (2014).